BILAL A. ESSAYLI
First Assistant United States Attorney
IAN V. YANNIELLO (Cal. Bar No. 265481)
Assistant United States Attorney
Chief, National Security Division
HAOXIAOHAN CAI (Cal. Bar No. 331131)
Assistant United States Attorney
Major Frauds Section
1500/1100 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone:      (213) 894-3667/0762
Facsimile:      (213) 894-0141
E-mail:    Ian.Yanniello@usdoj.gov
           Haoxiaohan.Cai@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>                  v.<br><br>ERIK FLEMING,<br><br>             Defendant. | No. CR 24-417-SPG<br><br>GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT ERIK FLEMING |

Plaintiff United States of America, by and through its counsel of record, the First Assistant United States Attorney for the Central District of California and Assistant United States Attorneys Ian V. Yanniello and Haoxiaohan Cai, hereby files its Sentencing Position Regarding Defendant Erik Fleming.

//

//

This position is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: April 29, 2026                    Respectfully submitted,

                                         BILAL A. ESSAYLI
                                         First Assistant United States
                                         Attorney

                                         IAN V. YANNIELLO
                                         Assistant United States Attorney
                                         Chief, National Security Division


                                                /s/
                                         IAN V. YANNIELLO
                                         HAOXIAOHAN CAI
                                         Assistant United States Attorney

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

2

**TABLE OF CONTENTS**

DESCRIPTION                                                                   PAGE

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION.................................................1

II.   DEFENDANT'S PLEA AGREEMENT AND RELEVANT FACTUAL BACKGROUND.....1

      A.    The Plea Agreement......................................1

      B.    Defendant Brokered Drug Transactions and Profited from
            Selling the Ketamine that Caused Mr. Perry's Death........2

            1.    Defendant Learned that Mr. Perry Was Seeking
                  Illicit Ketamine for Use at Home Without Medical
                  Supervision.........................................2

            2.    Defendant Sells 50 More Vials of Ketamine to Mr.
                  Perry...............................................5

            3.    Sangha and Defendant's Drugs Caused Mr. Perry's
                  Death...............................................6

            4.    After Learning of Mr. Perry's Death, Defendant
                  Communicated with Co-Conspirators about
                  Concealing the Drug Deals and Destroying Evidence....7

            5.    Defendant Agrees to Cooperate After Agents
                  Execute Search Warrants at His Home.................8

III.  SENTENCING GUIDELINES CALCULATION............................8

IV.   MOTION FOR DOWNWARD DEPARTURE FOR SUBSTANTIAL ASSISTANCE.......8

V.    A 30-MONTH SENTENCE IS JUST AND APPROPRIATE GIVEN THE
      AGGRAVATING CIRCUMSTANCES IN THIS CASE.......................10

      A.    Defendant Was An Addiction Counselor Who Chose To Sell
            Drugs to Someone with Decades of Well-Known Drug Abuse...10

      B.    Defendant Sold Drugs At A High Mark-Up For Profit and
            Made Reckless Assertions About the Safety of Sangha's
            Ketamine................................................11

      C.    Defendant's Criminal Conduct Would Have Continued But
            For Mr. Perry's Death...................................12

      D.    A 30-Month Sentence Avoids Unwarranted Disparities.......12

VI.   CONCLUSION.................................................13

i

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

**I.    INTRODUCTION**

Defendant Erik Fleming --- a licensed drug addiction counselor whose job it was to recognize and treat addiction --- sold 51 vials of ketamine to Matthew Perry in October 2023, including the ketamine that caused Mr. Perry's death.  At the time, defendant knew that Mr. Perry had suffered from addiction for many years.  But despite knowing the risk and dangers of selling the drugs, defendant brokered multiple drug transactions that ultimately killed Mr. Perry.

Law enforcement identified defendant as the dealer who sold the deadly ketamine to Mr. Perry and searched defendant's residence pursuant to a warrant.  After being caught, defendant expediently accepted responsibility and agreed to cooperate with the government's ongoing investigation, leading to the swift identification of co-conspirator Jasveen Sangha.

For the reasons set forth below, the government submits that a sentence of 30 months' imprisonment balances the significant cooperation defendant provided to the government --- including information that furthered the prosecution of a more culpable defendant, Sangha --- with the serious nature of defendant's criminal conduct and the life-ending harm it caused.  Under the circumstances, the recommended sentence is necessary, just, and appropriate to adequate to account for defendant's crimes and satisfy the sentencing goals of 18 U.S.C. § 3553(a).

**II.    DEFENDANT'S PLEA AGREEMENT AND RELEVANT FACTUAL BACKGROUND**

**A.    The Plea Agreement**

Pleaded guilty pursuant to a plea agreement to conspiracy to distribute ketamine, in violation of 21 U.S.C. § 856(a)(1) (Count

One), and distribution of ketamine resulting in death and serious bodily injury, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(E)(i) (Count Two).  (See Dkt. 9 [Plea Agreement].)

**B.      Defendant Brokered Drug Transactions and Profited from Selling the Ketamine that Caused Mr. Perry's Death**

As defendant admitted in his plea agreement, beginning on an unknown date but no later than in or around October 2023, and continuing until at least October 30, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant conspired with others known and unknown, including Co-Conspirators Kenneth Iwamasa (Iwamasa) and Jasveen Sangha (Sangha), to knowingly and intentionally distribute ketamine, a schedule III federally controlled substance.  Defendant joined the agreement knowing of its purpose and intending to help accomplish its purpose.

1.      Defendant Learned that Mr. Perry Was Seeking Illicit Ketamine for Use at Home Without Medical Supervision

In early-October 2023, defendant learned through a friend that Mr. Perry wanted to purchase ketamine that could be administered at home without medical supervision.  Even though defendant was a licensed alcohol and drug counselor, see PSR ¶¶ 96-101, defendant nonetheless reached out to Mr. Perry and offered to sell him ketamine.  To acquire the ketamine, defendant contacted Sangha using Signal, an encrypted communications application, to broker the sale of drugs to Mr. Perry.  Among other things, Sangha and defendant discussed the type and price of the ketamine that Sangha had available for sale.

On October 10, 2023, defendant told Mr. Perry that defendant had "a bunch of the K in liquid" that defendant could sell to Perry for a

2

"good price."  That same day, defendant began to communicate with Iwamasa --- Mr. Perry's live-in personal assistant --- to negotiate the sale of Sangha's drugs to Mr. Perry.  Iwamasa, for example, asked defendant, "How much do you want per bottle and what is the nice tip you want[?]" to which defendant responded, "Getting price now. I need some [money] upfront to pay when I pick up. And rest when I deliver." Defendant also sent Iwamasa an image of a ketamine vial that he had obtained from Sangha, noting: "10 ml vial – pure - $300 vial. Is 1000 fai[r] for me? – let me know how many vials."

The following day, October 11, 2023, defendant received messages from Sangha over Signal which defendant forwarded to Iwamasa. Among other things, Sangha represented that her ketamine was high quality and offered to provide a sample for Mr. Perry, stating "It's unmarked but it's amazing – he take one and try it and I have more if he likes." Defendant vouched for the quality of Sangha's drugs, noting: "She only deal[s] with high end and celebs. If it were not great stuff she'd lose her business." When Iwamasa inquired about the source of the "unmarked" ketamine, defendant assured Iwamasa that "[i]t's sealed in vials. It might be worth a try. I did some calling around about the Mexican stuff [a different type of ketamine Sangha had for sale] and it's fine for people too."

On or about October 12, 2023, defendant brokered the sale of a sample vial of ketamine for Mr. Perry.  Before driving to Sangha's residence to purchase the drugs, defendant confirmed the price for Iwamasa, stating: "The hook up was able to get the kind that is used for intermuscular. It's exactly what [Mr. Perry] wants ... She will give me the first one for 180. So you would need to Zell me 180 ... I guarantee it's going to be amazing." Defendant also made clear he

wanted to profit from the drug deal, noting "I wouldn't do it if there wasn't a chance of me making some money for doing this."  On October 13, 2023, defendant drove to Sangha's residence, in North Hollywood, California, to obtain the sample ketamine vial for Mr. Perry, which was an unlabeled, unmarked clear glass vial with a blue cap. Other than Sangha's representation that the clear liquid was ketamine, defendant had no knowledge about the contents of the vial, including the concentration or strength of the ketamine inside.

Later that same day, defendant drove to Perry's residence and delivered the ketamine vial to Iwamasa in exchange for $180. When defendant delivered the ketamine, or before, Iwamasa told defendant that he was administering ketamine to Mr. Perry through intermuscular injections. Based on conversations with Iwamasa, defendant knew that Iwamasa was employed as a personal assistant and had no medical experience or training.

Iwamasa injected Mr. Perry with defendant's ketamine a short time later and sent defendant a text message describing Mr. Perry's response, stating "seems good ...What number of bots does she have?" referring to defendant's ketamine supplier, Sangha. Defendant responded, "As many as u want" and "Let me know how many he wants and I'll confirm what she can get. But as of now she said she can fill any order."  Although defendant was obtaining vials of ketamine from Sangha for approximately $160 per vial, he marked up the price and told Iwamasa Sangha was selling each vials for $220. Iwamasa subsequently asked to purchase "25 vials $5500 @220 +500 for you for logistics."

4

2.    Defendant Sells 50 More Vials of Ketamine to Mr. Perry

On October 14, 2023, defendant met Iwamasa outside of Mr. Perry's residence, where defendant picked up $5,500 in cash to pay Sangha. That same day, defendant traveled to Sangha's residence in North Hollywood, California, where he delivered cash in exchange for 25 vials of ketamine. At the time, defendant and Sangha discussed Mr. Perry and the possibility of future ketamine sales. Defendant thereafter traveled back to Mr. Perry's residence, where he delivered 25 vials of ketamine to Iwamasa.

Less than 10 days later, on October 23, 2023, Iwamasa contacted defendant to purchase more ketamine, stating: "Can we do same as last time again over next 2 days?" Defendant confirmed he could obtain "another 25 bottles," and that "[i]t will be same product. You want same amount? Put the 5500 together asap and ill come get it as soon as possible to get it all done tonight." After Iwamasa agreed, defendant traveled to Mr. Perry's residence at approximately 8 p.m. on October 23 and picked up approximately $6,000 in cash from Iwamasa, which included cash intended for buying ketamine from Sangha.

Between October 23 and October 24, 2023, defendant told Sangha that they had another order from Mr. Perry and the two communicated multiple times to coordinate the sale of 25 additional vials of ketamine to Perry. Based on information from Sangha, defendant provided updates to Iwamasa about the timing and delivery of the ketamine. For example, defendant texted Iwamasa that Sangha's source of supply, who Sangha referred to as "master chef" and the "scientist," was working on making the large order of ketamine available. At approximately 10:47 a.m., on October 24, defendant told

Iwamasa, "[i]t's on its way to our girl," referring to Sangha, and "I should have an ETA anytime soon." Defendant subsequently picked up 25[1] vials of ketamine from Sangha at her residence and delivered the ketamine to Iwamasa at Mr. Perry's residence at approximately 10:52 p.m. on October 24.  Included in defendant's delivery of ketamine vials from Sangha were ketamine lollipops that Sangha include as an "add on" for the large ketamine order.

On October 26, 2023, defendant reached out to Iwamasa to suggest a better way of packaging a future delivery of ketamine, stating: "How are you? I realized on next shipment we could probably get it packaged in fewer bigger boxes instead or resale size."

### 3.    Sangha and Defendant's Drugs Caused Mr. Perry's Death

In the days leading up to October 28, 2023, defendant knew that Iwamasa was using the ketamine sold by defendant and Sangha to inject Mr. Perry with intramuscular injections. As noted above, defendant knew that Iwamasa was not a medical doctor and did not have training to administer controlled substances.

On October 28, 2023, Iwamasa injected Mr. Perry with at least 3 shots of ketamine obtained from defendant and Sangha. Mr. Perry was found later that day face down in a jacuzzi and deceased. The Los Angeles County Medical Examiner Medical conducted an autopsy and determined that Perry had a significant amount of ketamine in his blood and that his death resulted from the "acute effects of ketamine."  Mr. Perry's death was due to effects of ketamine that defendant and Sangha sold to Iwamasa, and that but for the presence

---

[1] The PSR mistakenly states that defendant picked up 16 vials of ketamine from Sangha. (PSR ¶ 28.)  As defendant admitted in his plea agreement, defendant purchased 25 ketamine vials on October 24, 2023 to sell to Mr. Perry.  (See Plea Agreement at 15.)

of that ketamine in Mr. Perry's bloodstream, Mr. Perry would not have died on October 28, 2023.

### 4. After Learning of Mr. Perry's Death, Defendant Communicated with Co-Conspirators about Concealing the Drug Deals and Destroying Evidence

After discovering that Mr. Perry had died, defendant coordinated with other members of the conspiracy about concealing their involvement in Mr. Perry's death. On the day of his death, Sangha called defendant on the Signal application and informed him about Mr. Perry's death. During the call, they discussed the need to distance themselves from the drug deal by, among other things, deleting digital evidence on their cell phones. Defendant also told Sangha that he would reach out to Iwamasa to gather more information about Perry's death. After the call concluded, Sangha sent a text to defendant reiterating that he should delete all of their prior text messages. Around the same time, Sangha updated the setting on the Signal application to automatically delete messages with defendant.

On or about October 30, 2023 --- two days after Mr. Perry's death --- defendant spoke with Iwamasa on the phone about Mr. Perry's death. During the call, Iwamasa told defendant that he had cleaned up the scene, including the ketamine bottles and syringes, and that he had "deleted everything." After speaking with Iwamasa, defendant reached out to Sangha using the Signal application to discuss the information he received from Iwamasa. Among other things, defendant told Sangha: "Please call ... Got more info and want to bounce ideas off you. I'm 90% sure everyone is protected. I never dealt with [Mr. Perry]. Only his Assistant. So the Assistant was the enabler. Also

they are doing a 3 month tox screening . . . Does K stay in your system or is it immediately flushed out[?]".

### 5.   Defendant Agrees to Cooperate After Agents Execute Search Warrants at His Home

In March 2023, federal agents and other law enforcement personnel executed federal search warrants, including a warrant to search defendant's residence.  Following the search, defendant provided information to law enforcement, including identifying Sangha as the source of the ketamine that defendant supplied to Mr. Perry.

## III. SENTENCING GUIDELINES CALCULATION

The government concurs with USPO's calculation of the total offense level as follows: a base offense level of 26, U.S.S.G. § 2D1.1(a)(4); less a 3-level reduction for acceptance of responsibility, U.S.S.G. § 3E1.1(a), (b), for a total of 23.  Based on a total offense level of 23 and a criminal history category of I, defendant's Guidelines range is 46 to 57 months.

## IV.   MOTION FOR DOWNWARD DEPARTURE FOR SUBSTANTIAL ASSISTANCE

Based on defendant's cooperation and substantial assistance provided to the government, the government seeks a five-level downward departure under U.S.S.G. § 5K1.1.

U.S.S.G. § 5K1.1 enumerates several factors that the Court should consider when determining whether a departure for "substantial assistance to authorities" is appropriate, including: (1) the significance and usefulness of the defendant's assistance; (2) the truthfulness, completeness, and reliability of the information provided by the defendant; (3) the nature and extent of the defendant's assistance; (4) the danger or risk of injury to the

8

defendant or his family resulting from his assistance; and (5) the timeliness of his assistance.

In this case, defendant provided credible information related to the drug conspiracy from his first interview with law enforcement.[2] When defendant began cooperating, the investigation already showed that defendant sold Mr. Perry the ketamine that had caused his death. However, defendant identified Sangha as the source of the deadly ketamine and provided information about Sangha's role in distributing ketamine to Perry multiple times in October 2023.  This information allowed law enforcement to expediently seek further search warrants, including warrants to search Sangha's residence.[3]

Additionally, defendant expediently accepted responsibility, pled guilty pursuant to a cooperation plea agreement, and agreed to testify against his co-conspirators.  Other than Iwamasa, defendant pled guilty before any other co-conspirator.

Based on the nature and timeliness of defendant's assistance, the government moves for a 5-level departure, which results in a total offense level of 18 and an advisory Guidelines range of 27 to

---

[2] The government notes that defendant was not fully forthcoming during his initial interview with law enforcement, as defendant attempted to conceal evidence he possessed on a laptop computer. After retaining counsel, however, defendant ultimately produced the files to the government.  As a result, the government is not seeking a two-level enhancement for attempting to obstruct justice under U.S.S.G. § 3C1.1.

[3] Defendant explained that he was not the ultimate source of the ketamine, and that instead, he had obtained the ketamine from Sangha, who he knew had the reputation of being the "Ketamine Queen." Defendant described meeting up with Sangha in North Hollywood on multiple occasions to purchase ketamine and provided details about Sangha's other drug trafficking activities.  In a later interview, defendant provided investigators with screenshots of Signal conversations between himself and Sangha that he preserved after Sangha had turned on the automatic deletion setting for their conversation about selling ketamine to Mr. Perry.

33 months.  If granted, the 5-level reduction significantly credits defendant's cooperation by reducing the applicable guidelines range by over 40 percent.

**V.   A 30-MONTH SENTENCE IS JUST AND APPROPRIATE GIVEN THE AGGRAVATING CIRCUMSTANCES IN THIS CASE**

For the reasons set forth below, the government recommends that the Court sentence defendant to: (i) 30 months' imprisonment; (ii) followed by three years' supervised release; and (iii) a mandatory special assessment of $200.  Such a sentence is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).

**A.    Defendant Was An Addiction Counselor Who Chose To Sell Drugs to Someone with Decades of Well-Known Drug Abuse**

Defendant's history and characteristics --- including the fact that he was an accredited and licensed alcohol and drug counselor at the time of his illegal drug sales to Mr. Perry --- justify the requested custodial sentence.  With this experience, defendant was acutely aware of the dangers of drug abuse, as he was professionally responsible for helping others overcome and fight their addiction. Defendant nonetheless deliberately undertook to sell illegal street drugs to a victim who had a public, well-documented battle with drug addiction.

As discussed in the PSR, defendant was an accredited alcohol and drug counselor II (CADC-II) and an internationally certified alcohol and drug counselor, whose license was active during the events of this case.  (PSR ¶ 96.)  Defendant also held jobs at no less than four different addiction treatment centers between 2021 and 2023. (PSR ¶ 98-101.)  Prior to that, defendant completed a program with a

10

Case 2:24-cr-00417-SPG    Document 43    Filed 04/29/26    Page 14 of 16   Page ID #:206

practicum component through the Sober College School of Addiction Studies Program.  (PSR ¶ 95.)  Defendant also appears to have struggled with his own addiction problems.  (PSR ¶ 88.)  Against this backdrop, defendant was well aware of the warning signs of drug seeking behavior --- and of Mr. Perry's history of addiction in particular --- but nonetheless elected to insert himself into Mr. Perry's addiction story to profit from it.

While the government is not seeking any enhancements pursuant to U.S.S.G. § 3A1.1(b) (Vulnerable Victim) or § 3B1.3 (Abuse of Position of Trust) because defendant did not deal drugs to Mr. Perry in the course of his work as an addiction counselor, the fact that defendant was trained to prevent against the very harm that he caused is an aggravating circumstance justifying the 30 month sentence.

**B.  Defendant Sold Drugs At A High Mark-Up For Profit and Made Reckless Assertions About the Safety of Sangha's Ketamine**

Although defendant's drug trafficking appear to be limited to the drug sales in October 2023, his criminal conduct nonetheless caused significant harm, including the loss of Mr. Perry's life.  As set forth in detail above, defendant knew about Mr. Perry's history of addiction and still chose to sell drugs to Mr. Perry to make money.  In defendant's words, "I wouldn't do it if there wasn't a chance of me making some money for doing this."  Defendant also marked up the ketamine he was selling and lied to Iwamasa about the price to make a higher profit from his illegal activity.

Additionally, unlike ketamine obtained from a medical provider with known concentration and related risks, defendant was selling ketamine contained in clear, unmarked vials that were sourced from someone Sangha knew as the "master chef" and "scientist."

11

Defendant's profit-seeking behavior and reckless distribution of dubiously manufactured drugs further justify the recommended 30-month custodial sentence.

### C. Defendant's Criminal Conduct Would Have Continued But For Mr. Perry's Death

Defendant sold Iwamasa ketamine for Mr. Perry on at least three occasions, including the last delivery, on October 24, 2024, of a bulk order of 25 vials.  However, two days after defendant dropped off the bulk order of ketamine, defendant attempted to sell even more drugs to Iwamasa and Mr. Perry.  On October 26, 2023, defendant reached out to Iwamasa and texted: "How are you?  I realized on next shipment we could probably get it packaged in fewer bigger boxes instead or resale size."  Thus, defendant was already trying to sell Mr. Perry on the "next shipment," even though the third delivery had just occurred a mere two days prior.  These messages show that but for Mr. Perry's tragic death, defendant would have continued to sell drugs to Mr. Perry --- a factor in aggravation.

### D. A 30-Month Sentence Avoids Unwarranted Disparities

Sentencing defendant to a mid-Guidelines sentence is just punishment for his crimes and will avoid sentencing disparities with similarly situated individuals.  The government's recommended sentence balances the significant cooperation defendant provided to the government --- including information that furthered the prosecution of a more culpable defendant, Sangha --- with the serious nature of the criminal conduct and the significant harm it caused. Indeed, a defendant who distributes illicit ketamine that causes a victim's death should expect a significant custodial sentence that falls within the relevant Guidelines range, or higher.

12

The government's recommended sentence is also justified in light of the sentences of defendant's co-conspirators. Defendant's sentence would be on par with Dr. Plasencia, who also received a 30 month sentence. Although defendant started with a higher Guidelines range than Dr. Plasencia because defendant sold the fatal dose of ketamine, defendant distinguished himself and earned (subject to the Court's approval) § 5K1.1 credit by cooperating with the authorities while Dr. Plasencia did not. And like the doctor defendants, defendant's professional training made him acutely aware of the dangers of supplying drugs to people struggling with sobriety. Defendant is also significantly less culpable than Sangha, because his drug dealing was limited to a few-week span in October 2023, whereas defendant Sangha had operated her high-volume drug business with impunity for the greater part of a decade, and because she sold ketamine against the backdrop of an earlier overdose victim. Defendant is also less culpable than Iwamasa, who abused his position of extreme trust by repeatedly inject drugs into Mr. Perry despite observing obvious signs of danger. A 30-month sentence is proportionate, avoids disparities, and satisfies the § 3553(a) factors.

**VI.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose the following sentence: (i) 30 months' imprisonment; (ii) followed by 3 years' supervised release; and (iii) a mandatory special assessment of $200.